UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:22-cr-189 (JMC) |
| v. | : | |
| | : | |
| LEVI GABLE, | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Levi Gable to 90 days' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

**I.   Introduction**

Defendant Levi Gable, a 37-year-old Vice President of his family's construction company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

Gable pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1). As explained herein, a sentence of incarceration is appropriate in this case because Gable breached the Capitol within

---

[1] Although the Statement of Offense in this matter, filed on September 23, 2022 (ECF No. 19 at ¶ 6), reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

approximately six minutes of the rioters' initial breach, entering through the Senate Wing Door when windows on both sides had been smashed. After contributing to the initial wave of rioters that breached the Capitol, Gable furthered the riot by remaining inside the Capitol for more than 30 minutes and joining rioters threatening the Speaker of the House of Representatives by repeatedly chanting "Nancy," while law enforcement desperately tried to secure the building. Gable then lied to the FBI when provided a chance to honestly disclose his conduct. Gable did all this despite having previously served years in prison for armed robbery, an experience which should have, but did not, deter him from joining a violent mob and lying to law enforcement.

The Court must also consider that Gable's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers (who were trying to prevent a breach of the Capitol Building) and to disrupt the critical proceedings inside the Capitol. Here, the facts and circumstances of Gable's crime support a sentence of 90 days' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 19 (Statement of Offense), at ¶¶ 1-7.

*Defendant GABLE's Role in the January 6, 2021 Attack*

Gable traveled by plane from Oklahoma to Washington, D.C. on January 5, 2021, to protest Congress' certification of the Electoral College. On January 6, Gable attended the "Stop the Steal" rally and then marched with other protestors to the Capitol.

Gable entered the Capitol from the West front, the scene of some of the most intense violence and conflict on the Capitol Grounds on January 6.  In a subsequent FBI interview, Gable admitted that he saw people fighting with police outside the Capitol and he observed, and was affected by, what he described as gas munitions used by police to control the crowd.[2] Nevertheless, Gable continued onto the Capitol Building and up the steps to the Upper West Terrace.

At approximately 2:13 pm, rioters smashed a window next to the Senate Wing Door using a riot shield.  This led to the first breach of the U.S. Capitol by a rioter who jumped through the window over the broken glass:



Image 1 (screenshot from Exhibit A)

---

[2] Gable's reference to gas munitions is likely a reference to pepper spray that law enforcement used at times on January 6, in efforts to control the rioters with non-lethal measures when the rioters refused commands to withdraw or disperse.

Approximately six minutes after the entry depicted above, Gable entered the U.S. Capitol through the Senate Wing Door, seemingly shouting triumphantly, as shown below (Gable is circled in red, and some of the smashed glass from the shattered windows is circled in blue).[3]



*Image 2 (screenshot from Exhibit A)*

Gable joined a cohort of rioters who were facing off with Capitol Police officers and chanting "Who's House? Our House," as those officers tried to hold a police line in the Crypt.[4] The image below, which is taken from a video that Gable uploaded to Facebook and appears to have recorded himself, shows that Gable was at the front of the mob confronting this police line. From this position, Gable could clearly see that the Capitol Police were trying to prevent rioters from advancing any further:

---

[3] A nine-minute, twelve-second clip from this surveillance camera, which shows both the initial breach at 1:58 and Gable's entry at 7:36, has been submitted directly to the Court and defense counsel via USAfx as Exhibit A.

[4] *See* Exhibit B, submitted directly to the Court and defense counsel via USAfx.

4



*Image 3 (screenshot from Exhibit B)*

After the rioters overran that police line, Gable travelled further into the Capitol with a group of rioters who were chanting "Nancy, Nancy, Nancy," an ominous taunt to Nancy Pelosi, the then Speaker of the House of Representatives. Gable video recorded the mob as it threatened Speaker Pelosi and uploaded this video to his Facebook page as well.[5]

Gable remained inside the Capitol at various locations, including the Crypt, National Statuary Hall, and an area outside the Rotunda Door, until approximately 2:53 pm. In total, Gable

---

[5] *See* Exhibit C, submitted directly to the Court and defense counsel via USAfx. The videos were removed from Facebook before the Government could obtain the evidence necessary to establish whether whether Gable uploaded these videos to Facebook in real-time, and thereby promoted the riot as it was ongoing, or whether he uploaded them in the hours or days immediately following the riot.

spent more than 30 minutes inside of the Capitol Building. Gable has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so. Statement of Offense at ¶ 13.

*Gable's FBI Interview*

On January 21, 2021, the FBI conducted a voluntary interview of Gable at his place of business in Oklahoma. Gable admitted to traveling to Washington D.C. on January 6 and being near the Capitol. He further admitted that he saw people fighting police officers and trying to get into the Capitol, and he stated that he was affected by what he believed to be gas munitions used by police to deter the crowd. On multiple occasions during the interview, however, Gable falsely denied that he entered the Capitol building. During the interview, Gable also did not express any remorse for his participation in the riot on January 6.

*The Charges and Plea Agreement*

On May 23, 2022, the United States charged Gable by criminal complaint with violating U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 26, 2022, law enforcement officers arrested Gable in Tulsa, Oklahoma. On May 26, 2022, the United States charged Gable by a four-count Information with violating U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 23, 2022, pursuant to a plea agreement, Gable pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Gable agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Gable now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Gable faces up to one year of

imprisonment and a fine of up to $100,000. Gable must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

IV. **The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Gable's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[6] | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | - 2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 37.

---

[6] The PSR incorrectly cites to U.S.S.G. §2B2.3(b)(1)(A)(i) for a trespass at a "secure government facility." PSR at ¶¶ 5, 30, 81. However, the specific offense characteristic that applies here is the offense characteristic arising where the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii). On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Because a two-level increase applies under either theory, there is no difference to the final offense level.

7

The U.S. Probation Office calculated Gable's criminal history as a Category II.[7] PSR at ¶ 79. Accordingly, the U.S. Probation Office calculated Gable's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0 – 6 months. PSR at ¶ 79. Gable's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

V.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

---

[7] Paragraph 40 in the PSR mistakenly lists "a criminal history category of I"; however, paragraph 79 correctly refers to "a criminal history category of II." PSR at ¶¶ 40, 79. Because the estimated Guidelines range is zero to six months in either case, there is no difference to the final estimated Guidelines range.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 "posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Gable's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Gable, the absence of violent or destructive acts is not a mitigating factor. Had Gable engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Gable's case is that he breached the Capitol Building through the Senate Wing Doors within approximately six minutes of the rioters' initial breach of the building.  There can be no doubt that Gable knowingly and willfully joined a dangerous mob of rioters that destroyed property and overran police lines to achieve its goal of storming the Capitol.  Based on Gable's own statements to the FBI, before he even entered the Capitol Building, he observed violence and was affected by what was likely pepper spray being used by police to fight back the mob of rioters attempting to breach the Capitol Building.  As shown above, when Gable entered the Capitol, the windows on both sides of the Senate Wing Door had recently been smashed by rioters, and broken glass was visible on the ground.  Gable then joined a mob making incendiary chants and confronting a police line in the Crypt, which clearly would have signaled to Gable that the rioters should not have been in the building and should not advance further. Nevertheless, when the rioters overran the police line in the Crypt, Gable continued with them, even as the rioters around him chanted the name of the Speaker of the House of Representatives.

9

Gable chose to glorify this lawless and menacing conduct by posting videos of it to his Facebook page.

Gable was interviewed by the FBI within weeks of January 6, 2021. By that time, he had removed all the posts from his Facebook page related to his participation in the riot on January 6. The interviewing agents provided Gable with multiple opportunities to admit that he had entered and remained in the Capitol Building. Gable chose to repeatedly lie to the agents, saying that he had not gone into the building—despite the facts, as could be proven by surveillance video and other evidence, that he breached the Capitol with the initial wave of rioters, and he remained inside for more than 30 minutes.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Gable

Gable's criminal history, including his extensive participation in an armed robbery for which he served 68 months in prison, is set forth in detail in the PSR. The PSR describes that Gable initiated an armed robbery scheme that ultimately involved the criminal participation of at least six individuals, including Gable's brother. PSR ¶ 39. Gable recruited the others into the scheme and stole a vehicle that the conspirators used to carry out the scheme. *Id.* The PSR further describes how the participants had multiple opportunities to abandon their criminal plan, but they continually pressed forward until they had completed the heist and divided up the proceeds. *Id.* Gable only turned himself in when he learned that his brother had been arrested. *Id.*

According to the PSR, Gable contends that, following his release from prison in 2011, he has focused on his family and his work while avoiding criminal conduct. Yet on January 6, 2021, Gable decided to join a violent mob that—according to his own admission—he saw fighting with

police officers as they tried to storm the Capitol. (Further, anyone in Gable's position, among the first wave of rioters to enter the building from the West front, would had to have seen significant violence, smelled tear gas, and heard flash bangs on their way from the west front up to the Senate Wing Door.) Gable chose to join this mob, he chose to march through the Capitol as the mob overran police lines and threatened members of Congress, and then he lied about it when confronted by the FBI.

Further, the PSR provides that Gable's compliance with the terms of his pretrial supervision has been inconsistent. PSR ¶ 9. The PSR states that Gable's attitude appears to be that complying with Court-ordered supervision is "inconvenient for him." *Id*. At the same time, Gable has not expressed any remorse for his criminal conduct on January 6, 2021, despite having observed law enforcement officers bravely defending our Capitol while subject to the persistent assaults of a violent mob—a brutal experience that was much more than an "inconvenience" for them.[8]

In this case, Gable's conduct, particularly considered alongside his past criminal history and his current attitude toward the supervision imposed by this Court, reflect a very real need for specific deterrence in the form of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United*

---

[8] The PSR indicates that Gable is regretful for what has happened, PSR ¶ 27, a conclusory statement which indicates nothing more than Gable's disappointment at the personal consequences for him for being charged with crimes.

11

*States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B)-(C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

*Specific Deterrence*

The facts here strongly suggest the need for specific deterrence. As set forth above, Gable chose to commit his crime despite having served 68 months in jail for armed robbery, an experience which should have made him more cautious, rather than less cautious, about joining a violent mob. Simply put, the specific deterrence achieved by Gable's earlier criminal sentence since his release from prison in 2011 appears to have worn off by January 2021.

Further, Gable's lack of remorse suggests that, without specific deterrence, there is a heightened risk that Gable would participate again in a similar crime if given the opportunity.

12

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[9] This Court must sentence Gable based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Gable has pleaded guilty to Count One of the Information, charging him with entering and remaining in a restricted area, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v.*

---

[9] Attached as Exhibit D to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

*Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Meteer*, 21-Cr-630 (CJN), the defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. Meteer, like Gable, had a criminal history: a felony conviction for tampering with evidence and a misdemeanor conviction for criminal possession of a weapon. Meteer, like Gable, breached the Capitol after he followed a mob of rioters that overran the police on the west side of the Capitol; he remained in the Capitol for more than 30 minutes; he lied to the FBI about the fact that he went into the Capitol; and he showed a lack of remorse. A circumstance present in Meteer's case, and not present here, is that the FBI found him in unlawful possession of ammunition upon conducting a search of his residence in August 2021; Gable's criminal history (an armed robbery conviction), however, is more severe than that of Meteer. The Government principally sought 75 days imprisonment to be followed by three years' probation in Meteer's case, and the Court imposed 60 days of jail time and the requested three years' probation.[10]

---

[10] Because Meteer pleaded guilty to a Class B misdemeanor, rather than a Class A misdemeanor, the Government sought, and the Court imposed, probation following the term of imprisonment rather than supervised release.

In *United States v. Simone Gold*, 21 Cr. 085 (CRC), the defendant, like Gable, pleaded guilty to one count of entering and remaining in a restricted area, in violation of 18 U.S.C. § 1752(a)(1). Gold entered the Capitol Building after observing a Capitol Police officer dangerously pulled into the crowd; Gold was part of the first group of rioters that breached the Capitol from the east (rather than the west) side; and Gold remained inside the Capitol for more than 30 minutes. Circumstances present in Gold's case, and not present here, are that she twice gave speeches inside the Capitol, and tried to ignore law enforcement commands to stop doing so; and that she sought to fundraise off her criminal conduct. Gold, however, did not lie to the FBI, and she had no criminal history. The Government principally sought 90 days imprisonment to be followed by one year of supervised release, and the Court imposed 60 days of jail time and the requested one year of supervised release.

In *United States v. Camper* (21 Cr. 325), the defendant, a former marine, pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. Camper entered the U.S. Capitol despite seeing violence between rioters and officers; he concealed video and audio evidence collected by the Go-Pro camera that he brought inside the Capitol; and he made statements to the media indicating a complete lack of remorse and suggesting the possibility of future violence. In *Camper*, the Government sought, and the Court imposed, 60 days jail time.

In *United States v. Pham* (21 Cr. 109), the defendant, an active duty police officer, saw people trying to incite the police during the riot; walked past knocked-down fences and other barricades to make his way inside the U.S. Capitol; entered the Capitol cheering "We're taking the house back!"; spent approximately 20 minutes roaming throughout the building and penetrated to an area of offices; falsely downplayed his conduct to FBI agents; and engaged in the

aforementioned conduct even though, as an experienced police officer, he in particular should have known the danger of it.  In *Pham*, the Government sought 60 days incarceration and the Court imposed 45 days.

In this case, as in *Meteer, Gold, Camper,* and *Pham,* the defendant saw many red flags that he was entering the Capitol during a dangerous riot; breached the Capitol (through a broken window) while acting triumphantly, thereby encouraging other rioters; as in *Camper* and *Pham,* he subsequently made false statements to the FBI; and as in all these cases, he has failed to show remorse.  And, as in *Meteer*, the defendant here is reasonably subject to higher expectations than other defendants because of his criminal history: as a person who had served 68 months in prison for armed robbery, he should have been particularly wary of joining a violent mob and should have known that such behavior would carry consequences.  Indeed, the defendant's prior criminal conviction warrants serious consideration, and represent a distinguishing feature of the defendant's history and characteristics that generally set him apart from others. Lying to law enforcement and participating in a violent incursion into the U.S. Capitol is bad enough, but when one considers the fact that the defendant was previously involved in the federal criminal justice system and appeared not to learn an enduring lesson, a profound sentence is warranted.

Thus, a sentence of 90 days' imprisonment and a year of supervised release here would be consistent with similar (albeit non-identical) cases and would not create an unwarranted disparity.

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Levi Gable to 90 days' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence would protect the community, promote respect for the law, and deter

future crime by imposing restrictions on the defendant's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

          Respectfully submitted,

          MATTHEW M. GRAVES
          United States Attorney
          D.C. Bar No. 481052

By:    */s/ Jason M. Manning*
       JASON M. MANNING
       NY Bar No. 4578068
       Trial Attorney, Detailee
       1400 New York Ave NW, 11th Floor
       Washington, D.C. 20005
       (202) 514-6256
       jason.manning@usdoj.gov

**CERTIFICATE OF SERVICE**

      On this 29TH day of December 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Jason M. Manning*
JASON M. MANNING
NY Bar No. 4578068
Trial Attorney, Detailee
1400 New York Ave NW, 11th Floor
Washington, D.C. 20005
(202) 514-6256
jason.manning@usdoj.gov
