# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | **1:22-cr-00189-JMC-1** |
| | : | |
| LEVI GABLE | : | |
| | : | |
| Defendant | : | |

## DEFENDANT LEVI GABLE'S SENTENCING MEMORANDUM

The Defendant Levi Gable, through counsel Steve Mercer and the law offices of RaquinMercer LLC, respectfully requests a sentence of probation as "sufficient, but not greater than necessary" to accomplish the purposes of 18 U.S.C. § 3553(a)(2). Furthermore, Mr. Gable requests that the Court condition the length of probation on the payment of restitution and the special assessment. Alternatively, Mr. Gable requests a sentence of probation with a term of home confinement. Mr. Gable is entitled to credit of one (1) day for the time he spent in custody on May 26, 2022 (the date of his arrest) until the Rule 5 hearing in the U.S. District Court for the Northern District of Oklahoma. 18 U.S.C. § 3585(b). Mr. Gable states the following in support of these requests.

## Impact of the Plea Agreement

On May 23, 2022, the Government charged Mr. Gable in a criminal information with four misdemeanor violations for entering the U.S. Capitol on January 6, 2021: (1) 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); (2) 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); (3) 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and (4) 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). The U.S. Marshalls arrested Mr. Gable on May 26, 2022, in Oklahoma and presented him for a Rule 5 hearing before the U.S. District Court for the

Northern District of Oklahoma (Magistrate Judge Jayne, presiding).  Judge Jayne ordered Mr. Gable released on May 26, 2022, subject to standard and special conditions.   Mr. Gable has complied with the conditions of pretrial release.

On September 23, 2022, Mr. Gable pled guilty under a Rule 11(b)(1)(B) plea agreement to entering the U.S. Capitol on January 6, 2021, in violation of Count One of the information (18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds)).  Mr. Gable agreed that the "Statement of Offense" attached to the plea agreement fairly and accurately described his actions and his involvement in the offense to which he pled guilty.  Mr. Gable acknowledged in the plea agreement that a violation of 18 U.S.C. § 1752(a)(1) carries a maximum sentence of one (1) year of imprisonment; a fine of $100,000, pursuant to 18 U.S.C. § 3571(b)(5); a term of supervised release of not more than one (1) year, pursuant to 18 U.S.C. § 3583(b)(3); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.  In addition, pursuant to 18 U.S.C. § 3013(a)(1)(A)(iii), Mr. Gable agreed to pay a special assessment of $25 per class A misdemeanor conviction to the Clerk of the United States District Court for the District of Columbia.  Mr. Gable also agreed as part of the plea to pay restitution to the Architect of the Capitol in the amount of $500.

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the parties stipulated that the adjusted offense level under the guidelines is 6 (U.S.S.G. § 2B2.3(a) – Base Offense Level 4; U.S.S.G. § 2B2.3(b)(1)(A) – Trespass at restricted building or ground +2).  The parties further agreed that a 2-level reduction is appropriate for Mr. Gable's acceptance of responsibility. Accordingly, the estimated offense level is 4.  The parties also estimated Mr. Gable's criminal history category is II based on a 68-month sentenced imposed in April 2006 for aiding and abetting

a federal bank robbery with a dangerous weapon.  Therefore, the estimated sentencing guidelines range is 0 month to 6 months (Zone A), and the estimated fine range is $500 to $9,500.

The parties agreed that a sentence within the estimated guidelines range would constitute a reasonable sentence considering all the factors set forth in 18 U.S.C. § 3553(a).  Furthermore, the parties agreed that, solely for purposes of calculating the applicable range under the guidelines, neither a downward nor upward departure is warranted.  Still, the parties agreed that either party could seek a variance and suggest that the Court consider a sentence outside the applicable guidelines range based upon the factors to be considered in imposing a sentence under 18 U.S.C. § 3553(a).

By accepting the plea agreement, Mr. Gable wants to impress upon the Court his profound remorse for participating in the riot, wrongfully entering the Capitol, and providing false information during a voluntary interview with federal law enforcement.  Given his significant history of demonstrated rehabilitation following his 2006 felony conviction at the age of 20, Mr. Gable is painfully aware how his actions violated the trust of his family, employees, and community.  From that very difficult place and time, Mr. Gable has refocused himself and come to terms with his misconduct by entering a plea of guilty.

## **The Legal Standard**

Mr. Gable requests a probationary sentence because it is a sentence consistent with the 18 U.S.C. § 3553(a) factors.  Section 3553 of Title 18 of the United States Code is the statutory basis of the Federal sentencing  structure. Section 3553(a) requires sentencing courts "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in the Sentencing Reform Act of 1984 ("S.R.A." or "Sentencing Reform Act").  Those purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In determining the sentence minimally sufficient to comply with Section 3553(a)(2), the sentencing court must consider several factors listed in Section 3553(a).   These include:  (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the need for the sentence imposed to meet the purposes of sentencing; (3) "the kinds of sentences available"; (4) "the guidelines and policy statements issued by the Sentencing Commission, including the guidelines range"; (5) "the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct"; and (6) "the need to provide restitution to any victims of the offense."   18 U.S.C. § 3553(a)(1), (a)(2), (a)(3)-(a)(7).

## A Probationary Sentence Serves the Purposes of Sentencing

**(1) "*The nature and circumstances of the offense and the history and characteristics of the defendant*"**

### a.   The Offense Conduct

The events of January 6th have been referred to both as a riot and an insurrection.  It is true that extremists, conspiracy theorists, and others affiliated with groups such as the Proud Boys, Oath Keepers, and Three Percenters, answered President Trump's call to action.  They prepared and planned to fight and "deliberately harnessed the mob's anger to overrun the Capitol."  *Select*

4

*Committee to Investigate The January 6th Report*, Analysis of the Attack, pp. 638-39 (House Report 117-000).  Their planning and preparation constituted an insurrection.  *Id.*  At the same time, there were many Americans present at the Capitol who were unaffiliated with these extremist groups.  These unaffiliated Americans were misled by President Trump's lies about the election.  They did not plan beforehand to trespass on the Capitol's grounds or enter the building.  *Id.*

Mr. Gable was among the unaffiliated Americans who responded to President Trump's call to come to Washington for a political rally on January 6, 2022.  Mr. Gable recalls that it was a spur of the moment decision motived by a desire to be heard and witness what he thought would be a historic political event.  As noted in the agreed stipulation of facts, Mr. Gable's purpose for the trip to Washington, D.C., "was to protest Congress' certification of the Electoral College."  Stipulation of Facts, p. 3, ¶ 8.  Mr. Gable did not come to Washington, D.C., to participate in or provoke an insurrection or a riot.  He was not wearing body armor nor a face mask.  Neither was he carrying pepper spray nor any dangerous weapon.  Mr. Gable honestly believed President Trump's lies about the elections and moreover, that the wrongful outcome of the election would be politically corrected.

On January 6th, Mr. Gable remained at the political rally held on the National Mall in front of the White House until the end of President Trump's speech.  Afterwards, he walked with a large crowd to the U.S. Capitol at President Trump's urging.  Before Mr. Gable left the political rally on the National Mall, the Proud Boys and their associates had already breached the fence at the Peace Circle before 1:00 pm.  Although Mr. Gable never prepared or planned to enter the Capitol, he—and many others—did.  "[A]t approximately 2:19 pm, [Mr.] Gable entered the Capitol through a location known as the Senate Wing Door."  Stipulation of Facts, p. 3, ¶ 10.  Before Mr. Gable entered through the Senate Wing Door with many other people, the windows in the door and adjacent to both sides of the door had been broken or smashed by others.  *Id.*  Mr. Gable would later state that he was "among

the first people" inside the Capitol but the surveillance video shows literally hundreds of people entering well before he did.

Mr. Gable, "together with others, remained inside the Capitol at various locations, including the Crypt, National Statutory Hall, and an area outside the Rotunda Door, until approximately 2:53 pm." *Id.* at p. 4, ¶ 11. Several CCTV videos recorded Mr. Gable inside the Capitol walking around and taking pictures or videos, among many other people. Mr. Gable took videos that included audio of people chanting "USA," "our house," and "Nancy." Another clip captured audio of a person verbally confronting a police officer guarding access to an area of the Capitol while another protestor appears to defuse the conflict. Still, other clips show very little conflict with officers. Mr. Gable did not damage or destroy property or engage in assaultive or threatening conduct. Mr. Gable left and returned to his hotel.

On January 21, 2021, law enforcement approached Mr. Gable at his office. He agreed to speak with them. He admitted to law enforcement that he and a friend flew to Washington, D.C., on January 5, 2021, to attend the January 6th rally at the U.S. Capitol. Mr. Gable related that they stayed at the Renaissance hotel during their visit to D.C. He provided his itinerary on January 6th, described the clothes he wore, and gave law enforcement his Facebook profile, cell phone number, and email address. When law enforcement asked him whether he went inside the Capital, he "falsely denied having entered the Capitol on January 6, 2021." (*Id.* at p. 4, ¶ 12). Mr. Gable regrets having lied to law enforcement. He knew better. Mr. Gable's unlawful action to provide false information, or to conceal or cover up material facts, during a voluntary interview with federal law enforcement, was motivated by a desperate, misguided desire to shield himself and those around him from his failure.

Law enforcement continued with its exhaustive investigation of Mr. Gable, including searches of CCTV video from the Capitol and the hotel he stayed at on January 5-8, 2021, his social media

accounts, cell phone service provider (including cell site location information), vehicle records, biographical information, and proprietary governmental and private databases.  Mr. Gable's offense conduct shows that he was one of many unaffiliated American who traveled to Washington, D.C., to attend a political rally at the urging of President Trump.  After the rally, he made a deeply regrettable decision to wrongfully enter the Capitol with a mob of people, a restricted governmental building.  Mr. Gable accepts full responsibility for his decisions and actions on January 6th.  Still, Mr. Gable did not act in a threatening or assaultive manner.  He did not destroy or deface any property.  He did not plan or prepare to enter the Capitol.  After approximately thirty minutes of walking around inside the Capitol taking pictures and video, he left and returned to his hotel.  When interviewed by law enforcement a few weeks later, he provided substantial information but also falsely stated that he did not enter the Capitol.

### b.  Mr. Gable's Characteristics

Among Mr. Gable's defining characteristics is his dedication to his family, work, employees, and community.  Mr. Gable married Anna Rochelle Gable in 2011 and they have a son, Levi Roy Gable Jr., who is now 10 years old.  Mr. Gable is very involved with his son and participates with him in Boy Scouts, outdoor sporting activities, and coaches him academically.  Mr. Gable is close with his father, siblings, and entire extended family.  They frequently are together for dinners and family events.

Mr. Gable went to work for his father's construction/excavation company in 2012.  Mr. Gable is now Vice President of GEI Utility Construction, which is based in Tulsa, Oklahoma.  He leads the company and is responsible for managing its daily operations and successful growth.  Due to his age and declining health, Mr. Gable's father is no longer capable to run the companies on a day-to-day basis.  GEI is a utility excavation business with 15-20 projects running at any

given time.  Mr. Gable's project management work is demanding.  Employees, vendors, and customers rely on his expertise.  Mr. Gable and his father also purchased a related company, while at the same time, Mr. Gable and two partners started another related business.  One is a hydro exaction business (Hydrok-USA).  The second is a utility locating company (True-Spot).  Mr. Gable is also responsible for the day-to-day operations of these three companies.  The businesses together employ on average 35 employees.

As the many character letters attest, Mr. Gable's core values include family, loyalty to his employees, a hard-working ethic, a generous spirit, and learning from his mistakes.  The attached character letters reveal that Mr. Gable is a talented leader of his companies and that the employees rely on his management for their shared success.  There are numerous anecdotes recounted of Mr. Gable's selfless acts for family, friends, neighbors, and employees.  The theme connecting these letters is Mr. Gable's concern for those around him.

Allen Fuller, who has known Mr. Gable and his family for more than 25 years, writes:

> When his father's health declined several years ago due to an accident and his previously successful business in the construction field suffered some setbacks, Levi at a young age stepped in and learned the family business.  Levi not only kept the business running, but also made several improvements and went out in the field to rebuild customer relationships and bring new customers on board. In the last several years Levi and his brother have expanded the business to levels never imagined.

(Exhibit A, Character Letters, pgs. 1-2).  Clay Staires, who has worked closely with and coached Mr. Gable as the manager of the family business, identifies Mr. Gable's character traits that have made him successful (patience, care, vision, accountability, and servanthood).  *Id.* at 3.  Mr. Gable's father speaks to his son's dedication to family, community, and work.  *Id.* at 4-5.  Mr. Gable's life-long friend, Jeremy Collins, recounts his work and family ethics and the obstacle that he has overcome.  *Id.* at 6.  Michael Christenberry, an engineer with a utility customer of Mr.

Gable's business, shares his view of Mr. Gable as an honest and ethical businessman. *Id*. At 7-8. Matt Sanders, whose father worked for Mr. Gable, recalls how generously Mr. Gable treated his father when he was sick with cancer. *Id.* at 9-10. Mike Early, a competitor of Mr. Gable's business, also relates how Mr. Gable's good character results in a healthy relationship between their firms. *Id*. at 11-12. Shawn Morales, a long-time family friend, recounts how Mr. Gable helped an employee in need of new tires for an aging car without giving it a second thought. *Id.* at 13-14. Travis DeArmond, a neighbor of Mr. Gable, remembers how Mr. Gable came to his aid clearing land without asking anything in return. *Id*. at 15-16. GaryAnn Tomkalski, who knows Mr. Gable through his work, remarks on the qualities that have made him a success. One example she recalls is Mr. Gable's generosity towards a newly hired employee and his pregnant girlfriend who were homeless. Without question, Mr. Gable put them up in a hotel until they could get on their feet. *Id*. at 17-18. Mr. Gable's wife, Anna Gable, relates how great a father he is to their son and, despite being consumed with work, makes time for him and their marriage. *Id*. at 19-20. Numerous other character letters confirm Mr. Gable's positive characteristics. *Id.* at 21-102.

These aspects of Mr. Gable's life are powerful evidence of his rehabilitation following a 2006 felony conviction at the age of 20 for bank robbery with a dangerous weapon. On May 3, 2006, Mr. Gable pled guilty and was sentenced to 68 months incarceration and 3 years of supervised release, with restitution and a special assessment. The arc of Mr. Gable's life is remarkable considering his conviction at a young age. As a youthful offender with a felony conviction, the odds were stacked against Mr. Gable. Still, Mr. Gable met that challenge. Following his release in 2011, Mr. Gable was highly motivated to turn his life around—and he did. As a result of his positive adjustment and re-entry to the community, his supervised release was terminated early in 2013.

Mr. Gable's many successes in his life and his demonstrated rehabilitation means that he understands how wrong he was to be caught up in the events of January 6th.  At the time, he believed, as did many Americans, the falsehoods about the elections.  In hindsight, he sees how misguided he was in this thinking.  He is truly regretful and deeply remorseful.  Mr. Gable knows that he has come too far to put his family and many business achievements at such risk.  Moreover, he is incredibly anxious about incarceration because of the impact it would have on the daily operations of the many excavation projects for the utility related companies that he manages.  To Mr. Gable, the point is not the impact of incarceration on himself, but its impact on the nearly 40 families who rely on him to manage and lead the businesses of GEI, Hydrok-USA, and True-Spot.

**(2)** ***The need for the sentence imposed to meet the purposes of sentencing***

As set forth below, an individualized assessment of Mr. Gable's circumstances demonstrates that probation is a sufficient but not greater than necessary sentence to meet the purposes of sentencing.  Taken together, Mr. Gable's plea of guilty, the conviction, pretrial release conditions, the payment of restitution, and probation, reflect the seriousness of his offense, and promotes respect for the law.  Notably, Mr. Gable's businesses already suffered a reputational hit following his arrest and prosecution.  Mr. Gable has struggled to restore his standing in the community which started with his acceptance of responsibility.  Probation with standard and special conditions provides Mr. Gable with just punishment and affords adequate deterrence to future criminal conduct.  The benefit to probation is that it keeps Mr. Gable in the community where he has come to terms with his actions on January 6th.  If the Court concludes that a period of incarceration is called for in these circumstances, Mr. Gable would request a period of home confinement.

**(3)** *"The kinds of sentences available"*

In Mr. Gable's circumstances, "the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007), is the guideline range, which reflects the defendant's criminal conduct and the defendant's criminal history. Indeed, the very purpose of the guideline range is to provide a sentencing court with a framework for addressing specific offense and offender characteristics in a reasonably consistent manner. *Id.*, *see also* 28 U.S.C. § 991(b)(1)(B), 18 U.S.C. § 3553(a)(6), "provide certainty and fairness," *see* 28 U.S.C. § 991(b)(1)(B), and "promote respect for the law," *see* 18 U.S.C. § 3553(a)(2)(A). Here, within the guideline range, the Court is authorized to impose a sentence of probation or imprisonment because the applicable guideline range is in Zone A of the Sentencing Table. U.S.S.G. § 5B1.1(a) (Imposition of a Term of Probation). In determining whether to impose a term of probation (and if so, the length and conditions of probation) or imprisonment (and if so, the length and conditions of supervised release) the sentencing court is required to consider the statutory factors set forth in 18 U.S.C. § 3553(a).

The Sentencing Commission's introductory commentary to Chapter 5 Part B of the sentencing guidelines provides guidance regarding a sentence of probation:

> The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself. 18 U.S.C. § 3561. Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant.

Part B – Probation (Introductory Commentary). Application Note 1(A) explains that the sentencing court may impose community confinement, home detention, or intermittent confinement as conditions of probation to accomplish the statutory goals of sentencing:

11

1.      Except where prohibited by statute or by the guideline applicable to the offense in Chapter Two, the guidelines authorize, but do not require, a sentence of probation in the following circumstances:

> (A) Where the applicable guideline range is in Zone A of the Sentencing Table (i.e., the minimum term of imprisonment specified in the applicable guideline range is zero months). In such cases, a condition requiring a period of community confinement, home detention, or intermittent confinement may be imposed but is not required.

U.S.S.G. § 5B1.1 (Commentary); *see also* Part F – Sentencing Options, § 5F1.1 (Community Confinement); § 5F1.2 (Home Detention); § 5F1.8 (Intermittent Confinement).[1]   The special

---

[1] Application Note 1 to § 5F1.1 (Community Confinement) provides:

> "Community confinement" means residence in a community treatment center, halfway house, restitution center, mental health facility, alcohol or drug rehabilitation center, or other community facility; and participation in gainful employment, employment search efforts, community service, vocational training, treatment, educational programs, or similar facility-approved programs during non-residential hours.

Application Note 1 to § 5F1.2 (Home Detention) provides:

> "Home detention" means a program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs, and such other times as may be specifically authorized. Electronic monitoring is an appropriate means of surveillance and ordinarily should be used in connection with home detention. However, alternative means of surveillance may be used so long as they are as effective as electronic monitoring.

Application Note 1 to § 5F.8 (Intermittent Confinement) provides:

> Intermittent confinement may be imposed as a condition of probation during the first year of probation. See 18 U.S.C. § 3563(b)(10). It may be imposed as a condition of supervised release

condition of community service may also be appropriate on a case-by-case basis.  § 5B1.3(e)(3) & §
5F1.3 (Community Service).

 As to the length of probation, the guidelines provide two broad ranges for the duration of
probation depending on the offense level.  When probation is imposed, the term shall be at least one
year but not more than five years if the offense level is 6 or greater, and no more than three years in
any other case.  U.S.S.G. § 5B1.2(a)(1) & (2).  Within these broad guidelines, the length of probation
is within the discretion of the sentencing judge.  U.S.S.G. § 5B1.2 (Commentary).  The Commission's
official commentary indicates that the sentencing judge may set the term of probation to enforce
conditions such as fine or restitution payments, or attendance in a program of treatment such as drug
rehabilitation.  *Id.*

 Part C (Imprisonment) of Chapter 5 further provides the following guidance:

> If the applicable guideline range is in Zone A of the Sentencing
> Table, a sentence of imprisonment is not required, unless the
> applicable guideline in Chapter Two expressly requires such a term.

U.S.S.G. § 5C1.1(b).  The Commission's Application Note 2 explains:

> Subsection (b) provides that where the applicable guideline range is
> in Zone A of the Sentencing Table (i.e., the minimum term of
> imprisonment specified in the applicable guideline range is zero
> months), the court is not required to impose a sentence of
> imprisonment unless a sentence of imprisonment or its equivalent is
> specifically required by the guideline applicable to the offense.

---

> during the first year of supervised release, but only for a violation of
> a condition of supervised release in accordance with 18 U.S.C. §
> 3583(e)(2) and only when facilities are available. See 18 U.S.C. §
> 3583(d).

Application Note 1 to § 5F1.3 (Community Service) provides:

> Community service generally should not be imposed in excess of
> 400 hours.  Longer terms of community service impose heavy
> administrative burdens relating to the selection of suitable
> placements and the monitoring of attendance.

> Where imprisonment is not required, the court, for example, may impose a sentence of probation. In some cases, a fine appropriately may be imposed as the sole sanction.

U.S.S.G. § 5C1.1 (Commentary).  Application Note 4 relates that if the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B, the court should consider imposing a sentence other than a sentence of imprisonment.  *See* 28 U.S.C. § 994(j).  In the event the Court imposes a sentence of imprisonment, it may order a term of supervised release to follow. 18 U.S.C. § 3583(a).  In determining whether to impose a term of supervised release (and if so, the length and conditions of supervised release), the sentencing court is required to consider the statutory factors set forth in 18 U.S.C. § 3553(a).  *See*, 18 U.S.C. § 3583(c).

### (4)  "*The guidelines and policy statements issued by the Sentencing Commission, including the guidelines range*"

In *United States v. Booker,* 543 U.S. 220, 226-27 (2005), the Supreme Court ruled that the Sixth Amendment, as interpreted by the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), mandates that the Guidelines can no longer operate as mandatory sentencing rules.   The *Booker* Court held that two provisions of the Sentencing Reform Act, 18 U.S.C. § 3553(b)(1) (the provision of the federal sentencing statute that requires sentencing courts to impose a sentence within the applicable Guidelines range, absent a basis for departure) and 18 U.S.C. § 3742(e) (the provision that establishes standards for appellate review), must be severed and excised.  *Booker,* 543 U.S. at 259.

Thus, after *Booker*, the guidelines have only an advisory force.  *United States v. McKeever,* 824 F.3d 1113, 1119 (D.C. Cir. 2016).   Subsequent cases decided by the Supreme Court have affirmed the district courts' authority to sentence defendants within the range of choice dictated by the facts and circumstances of the case before the Court.    In *Rita v. United States*,  551 U.S. 338, 351 (2007), the Supreme Court made clear that a district court may consider arguments that

a "Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a)'s considerations." While the Court must consider the Guidelines in determining a sufficient sentence, *Gall v. United States,* 552 U.S. 38, 49-50 (2007), it may not presume that a Guidelines sentence is correct.  *Rita,* 551 U.S. at 351.  *See also Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (noting that sentencing courts may vary from the advisory Guidelines range based solely on policy considerations, including disagreement with the policy underlying the Guidelines in a case); *United States v. Terrell*, 696 F.3d 1257, 1261 (D.C. Cir. 2012) ("A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence.") (quoting *Unites States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007)); *United States v. Raby*, 575 F.3d 376, 381 (4th Cir. 2009) (The sentencing process "does not include according a presumption of reasonableness to a sentence calculated under the Sentencing Guidelines, and a district court's application of a presumption of reasonableness to a Guidelines sentence is error.")

The result of this change in the Federal sentencing scheme is that district courts may "take account of" the advisory Guidelines range as part of all the sentencing goals and factors enumerated in 18 U.S.C. § 3553(a) but are no longer bound by the sentencing range indicated by the applicable range in the case.  *Cunningham v. California,* 549 U.S. 270, 286 (2007).  The advisory guidelines are, therefore, only "the starting point and the initial benchmark" in determining a sentence and not the only consideration.  *Gall,* 552 U.S. at 49.  Sentencing judges "must make an individualized assessment based on the facts presented." *Id.* at 50.  Here, an individualized assessment strongly militates in favor of a probationary sentence.

As noted above, the Court must determine a sentence that is "sufficient, but not greater than necessary, to comply with the purposes … (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate

deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2).  To be sure, the offense at hand is serious and Mr. Gable genuinely acknowledges that fact.   Mr. Gable's demonstrated rehabilitation following his 2006 conviction

To be sure, in determining whether to impose a sentence of probation or imprisonment, one relevant specific offender characteristic is a defendant's criminal history.  *See* 28 U.S.C. § 994(d)(10); U.S.S.G. § 5H1.8 (Criminal History).  A related characteristic is the degree of dependence upon criminal history for a livelihood.  *See* 28 U.S.C. § 994(d)(11); U.S.S.G. § 5H1.9 (Dependence upon Criminal Activity for a Livelihood).  However, these specific offender characteristics do not militate in favor of a sentence of imprisonment for Mr. Gable.

As the Commission explains, "Generally, the most appropriate use of specific offender characteristics is to consider them not as a reason for a sentence outside the applicable guideline range but for other reasons, such as in determining the sentence within the applicable guideline range, the type of sentence (e.g., probation or imprisonment) within the sentencing options available for the applicable Zone on the Sentencing Table, and various other aspects of an appropriate sentence."  Part H – Specific Offender Characteristics (Introductory Commentary).

Still, the nature, extent, and significance of a specific offender characteristic can involve a range of considerations.  For example, the extent to which a defendant's criminal history reflects the likelihood of recidivism provides central guidance on the weight to give that history.  *See, e.g.*, U.S.S.G. § 4A1.3 (authorizing departures when a defendant's criminal history does not adequately reflect the likelihood of recidivism).  Similarly, the extent to which a defendant's criminal history reflects the degree of a defendant's criminal livelihood can inform the weight to give that history.

*See, e.g.*, U.S.S.G. § 4A1.3 (Criminal Livelihood).  Where a defendant's criminal history neither reflects a risk of recidivism nor a pattern of criminal conduct, it loses relevance as a factor to the sentencing court's decision whether to impose probation or incarceration.

In the case at hand, Mr. Gable's criminal history does not shift the balance from probation to incarceration.  Considering the reliable evidence of Mr. Gable's rehabilitation since his release from prison in 2011, his 2006 conviction at the age of 20 does not indicate a likelihood of recidivism.  Mr. Gable's character should not be viewed through the lens of that criminal history. Common sense and empirical data shows that the older the prior record, the less likely it is to predict a person's recidivism.  Two well-documented empirical facts inform that assessment:  (1) Individuals who have offended in the past are relatively more likely to offend in the future, and (2) the risk of recidivism declines as the time since the last criminal act increases.  Thus, immediately after an arrest, the risk of recidivism is significantly greater than the overall risk of offending. Kurlychek, Brame, Bushway, *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?* Vol. 5, Issue 3, Criminology & Public Policy (2006).  However, among those who last offended six or seven years ago, the risk of reoffending approximates the risk of new offenses among persons with no criminal record.

Mr. Gable's 2006 conviction is not a risk factor for recidivism and it does not show that he is a danger to the community.  The instant offense was neither economically motivated nor a crime of violence.  Mr. Gable is not a threat to the community.  On the contrary, he substantially contributes to the community's well-being and the lives of his employees. Mr. Gable is a trusted business leader in his community who employee 35 people who rely on him to successfully manage the company.   Therefore, Mr. Gable's incarceration is not necessary to accomplish the goals of sentencing.

**(5) "*The need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct*"**

By all accounts, the instant offense was an aberration considering Mr. Gable's stable family and long-standing employment history.  Mr. Gable's offense conduct did not involve the destruction of property, assaultive behavior, nor the brandishing of pepper spray or any dangerous weapon.  He was not wearing protective gear and did not show up prepared for a riot.  Mr. Gable did not engage in the sort of violent or seditious conduct that has warranted incarceration in cases of a similar nature.

**(6) "*The need to provide restitution to any victims of the offense*"**

Mr. Gable has agreed to pay restitution.  The Court can enforce Mr. Gable's obligation to pay restitution by making it a condition of probation.

## Conclusion

Mr. Gable is profoundly remorseful for the behaviors that bring him before the Court and painfully aware of the destructive force of those decisions.  Mr. Gable's actions put at risk the stability of his family, businesses, employees, and standing in his community.  However, through his acceptance of responsibility, Mr. Gable has redirected himself and begun to rebuild in his community.  A sentence of probation is reasonable considering the nature of the offense and Mr. Gable's characteristics, the need to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public.  It is sufficient, but not greater than necessary to accomplish the goals of sentencing.

Respectfully submitted,

/s/
By: _____
Steve Mercer #12855
RaquinMercer L.L.C.
50 Montgomery Ave., Ste. 200
Rockville MD 20850
Tel:      (301) 880–9270
Email:    Steve@RaquinMercer.com

*Counsel for Levi Gable*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this sentencing memorandum was served on all parties of record on December 29, 2022, *via* the electronic filing system.

/s/
By: _____
Steve Mercer #12855

### INDEX OF LETTERS OF SUPPORT

1.  Mr. Allen Fuller 1-2
2.  Mr. Clay Staires 3
3.  Mr. Daniel Gable 4-5
4.  Mr. Jeremy Collins 6
5.  Mr. Michael Christenberry 7-8
6.  Mr. Jerry (Matt) Sanders 9-10
7.  Mr. Mike Early 11-12
8.  Mr. Shawn Morales 13-14
9.  Mr. Travis DeArmond 15-16
10. Mrs. GaryAnn Tomkalski 17-18
11. Mrs. Anna Gable 19-20
12. Mr. Aaron Simms 21-22
13. Mr. Andy Jordan 23-24
14. Mr. Brett Copeland 25
15. Mr. Herman David Kennicutt 26
16. Mr. Chris Haws 27
17. Mr. Clay Clark 28-29
18. Mr. Cody Bear 30-31
19. Mr. Court Pratt 32
20. Mr. Darrell Moody 33-34
21. Mr. Geoffrey Adrin 35
22. Mr. Ioe Ousley 36
23. Mr. Jacob Gable 37
24. Mr. Jeff Wellemeyer 38-44
25. Mr. Kary Bryce 45
26. Mr. Klayton French 46
27. Mr. Martin Stewart 47-48
28. Mr. Zachary Nelson 49
29. Mr. Milan Janicich 50-51
30. Mr. Bryan Radosevich 52
31. Mr. David Cleveland 53
32. Mr. Richard Sanner 54-55
33. Mr. Robert Brown 56-57
34. Mr. Rodney Turner 58
35. Mr. Ron Lamb 59-60
36. Mr. Scott Wedman 61-62
37. Mr. Shawn Lowman 63-64
38. Mr. Terry Collins 65
39. Mr. William Patterson 66-67
40. Mr. William Rosson 68-69
41. Mr. William Young 70
42. Mrs. Abbie Collins 71-72
43. Mrs. Doniema Kolkmann 73-74

44. Mrs. Jakeiha Gable 75-76
45. Mrs. Jamie Meadors 77
46. Mrs. Joyce Townsend 78-79
47. Mrs. Kelle McCan 80-81
48. Mrs. Lisa Isenhower 82-83
49. Mrs. Misty Walker 84-85
50. Mrs. Rhonda Perkins 86-87
51. Mrs. Roianne Koster 88
52. Mrs. Stacy Stewart 89-90
53. Mrs. Susan Collins 91
54. Mrs. Vanessa Clark 92-93
55. Ms. Esther Phillips 94-95
56. Ms. Heather Sztenderowicz 96-97
57. Ms. Johnette Wenz 98-99
58. Ms. Michelle Cash 100
59. Ms. Sarah Loomis 101
60. Ms. Whitney Stout 102